## Fidelity Trust Company *v.* Gardiner et ux., Appellants.

Argued March 16, 1959. Before Rhodes, P. J., Hirt, Wright, Woodside, Ervin, and Watkins, JJ. (Gunther, J., absent).

*William R. Mark,* for appellants.

*Edwin M. Blumenthal,* for appellee.

OPINION BY HIRT, J., November 11, 1959:

On July 24, 1956, plaintiff, Fidelity Trust Company, entered judgment by confession on a note of the defendants for $2,029.20. The note on its face provided for the payment by the defendants of the above amount in 60 monthly payments from July 14, 1956, of $33.82 each. The payee named in the note was Premier Insulation Sales which had assigned it to the plaintiff Trust Company. Alleging defendants' failure to make the monthly payments according to its terms—a default which made the unpaid instalments immediately due and payable—Fidelity Trust Company on February 11, 1957, issued an execution by writ of fi. fa. to collect the whole of the principal sum. The defendants, asserting fraud permeating the whole transaction, petitioned the lower court to open the judgment and to let them into a defense. The order refusing relief will be reversed.

There is no denial of the testimony of the defendants taken on depositions in support of their petition. Undoubtedly they were imposed upon in the transaction which gave rise to the present controversy and in our view the defense of fraud is open to them, in questioning the right of the bank to recover, under the circumstances. Of necessity the proofs must be referred to, somewhat in detail.

The defendants, husband and wife, in April 1956, bought a modest home in Shippensburg, and financed the purchase with the proceeds of a "G.I." mortgage.

Both were employed, he as a mechanic and she, sewing facings on the cuffs of pants for a clothing manufacturer. Their combined wages constituted the sum total of their financial resources. They were, inexperienced in even ordinary business affairs; their common schooling had ended with or before the end of the 8th grade. Six months after they bought the house, on or about June 8, 1956, they were visited by one Alex DiSantis, who falsely posed as a representative of "Reliable Home Improvement" of Harrisburg. As such, he induced the defendants to enter into a contract with his purported principal for the covering of their house with "Aluminum Siding". For the work to be "done in a workmanship like manner" the contract provided for the payment by the defendants of "the sum of $1,500.00 plus legal rate of interest, payable . . . in 60 equal monthly instalments of $33.72. First payment to be made 45 days after completion." The carbon copy of the contract delivered to the defendants, in evidence as their exhibit No. 1, is on the printed form of the Reliable organization. At the top of defendants' original copy, the contract (in form usual to a letterhead) this printed caption appears in bold type:

RELIABLE HOME IMPROVEMENT

1024 Paxton Street, Harrisburg, Pa.

Phone Cr 6-7479

During the negotiations, the defendants had protested that they had only recently incurred the mortgage payments incident to the purchase of their home and that they could not afford any additional financial obligation. DiSantis met this objection by stating that his principal, impliedly Reliable Home Improvement, wanted a model home, so improved, to show other and future prospective customers and that the defendants (because of the advertising value of their improved home) would receive as credits on their contract of a

3% commission on the first six other improvement contracts secured, amounting to between $600 and $900 (and at least $600), and accordingly would not have to make payments on the contract price of the improvement for 12 or 14 months. It was these representations which induced the defendants to sign the contract.

Under pressure from the plaintiff bank the defendants did make two monthly payments on the note but then stopped payment on their check sent in payment of a third. They then complained to Reliable Home Improvement in writing at its office in Harrisburg of its failure to respect its agreement that no payments were to be required from them during the first year of the life of the contract. In response to their letter, one Himes, the manager of the Reliable organization, came to defendants' home and then for the first time they were informed that they did not have a contract with Reliable; that Alex DiSantis was not a representative of Reliable and that Reliable did not do the work of applying aluminum siding to their house. On Himes' advice, after he was informed as to all of the circumstances, the defendants stopped further payments to the plaintiff.

It subsequently appeared that DiSantis had clipped the heading, Reliable Home Improvement (above quoted) from his copy of the original contract, after it had been signed by defendants, and in a space in the body of the writing, left blank for the insertion of specifications of "Roofing" improvements (none were involved here), the name "PREMIER INSULATION SALES, R.D. 3, HARRISBURG, PA." was imprinted by means of a rubber stamp. Without notice to or knowledge of defendants the work was actually performed by Premier and not by Reliable. Before any work was done on defendants' house, an unnamed person (later identified as one Koons acting for the Premier group) presented a

"Property Improvement Loan Application" to the defendants which they signed on the representation that its purpose was to "get us a lower rate" of interest— "a cheaper monthly rate from another company." On this person's representation that he had all of the information necessary to fill in the body of the application, the defendants, at his request innocently signed the application in blank. It was dated back to June 8, 1956, the date of the contract with Reliable, although actually executed somewhat later. Attached to the application, "by perforation" was the note, which, with the blanks filled in, and the subsequent date of July 14, 1956 inserted, is the note upon which the present judgment was entered. Defendants had no recollection of signing the note but in this record they frankly admit that the signatures are theirs. In the so-called credit application Koons had inserted a figure of $6,- 200 which was more than the purchase price of defendants' house and in referring to defendants' automobile as one of their assets he misrepresented it as a 1953 model whereas it was in fact a 1949 Chevrolet.

The note in judgment, on its face was made payable to "Premier Insulation Sales". It was endorsed "Without Recourse pay to the order of Fidelity Trust Company" . . . [signed] "Premier Insulation Sales by Irvin S. Koons (Owner)". Below the endorsement, over the signature of one Herbert U. Englert there is also an impression of a rubber stamp, which however must be ignored because so blurred as to .be wholly illegible. On discounting the note the plaintiff paid Premier Insulation Sales $1,488.00. This is its total investment in defendants' obligation upon which execution has issued to collect $2,029.20.

Under the terms of the contract which defendant signed there was no obligation on them to finance the cost of the improvement. And the "Property Improve-

ment Application", to which the note was attached by perforation, was secured from the defendants wholly for the benefit of Premier. In it the only reference to the bank is the following which appears thus on the last line of the judgment note, above the space for the signatures: "Fidelity Trust Company is hereby authorized to pay the proceeds of this note when and if purchased to the order of ————————————." The so-called Property Improvement Application with the note attached was dated June 8, 1956. The note in the hands of the plaintiff bank, by assignment from Premier, bears the date of July 14, 1956.

Following their return from a vacation about the middle of July 1956, an individual representing himself to be the brother of Alex DiSantis called upon defendants and asked them to sign another paper, the purpose of which according to his statement was that "the men who did the work would be paid out". The defendants signed this paper also, and without reading it, on the representation that Alex DiSantis would make good any deficiencies in the performance of the work. The work in fact had not been performed in strict accord with the contract but the defendant husband himself later made good the defects and there is no present complaint on that score. The above paper is addressed to Fidelity Trust Company, Pittsburgh 30, Pa. on the bank's printed form, under the heading "Borrowers Certificate of Completion. Do not sign this certificate until the work has been satisfactorily completed or materials delivered". It is dated July 14, 1956 and the certificate signed by the defendants, in material respects, provides: *"I (We) certify that I (we) have not been given or promised a cash payment or rebate nor has it been represented to me (us) that I (we) will receive a cash bonus or commission on future sales as an inducement for the consummation of this transaction. I (we) un-*

derstand that the selection of the dealer and the acceptance of the materials used and the work performed is my (our) responsibility, that Fidelity Trust Company does not guarantee the material or workmanship or inspect the work performed, and that I (we) will not assert any claims or defenses against Fidelity Trust Company. I (We) hereby certify that all articles and materials have been furnished and installed and the work satisfactorily completed on premises indicated in my (our) Credit Application." (Emphasis added).

The plaintiff discounted the note on July 19, 1956 and, as above stated, entered judgment thereon five days later, on July 24, 1956. The defendants brought this proceeding to open the judgment and to be let into a defense, on the advice of the manager of Reliable Home Improvement as we have noted, who sensed fraud permeating the whole transaction. And it is a fact of much importance, in our view, that in the hearings on the rule in this case Alex DiSantis was not called as a witness by either Premier or by the bank. In effect therefore the plaintiff Trust Company concedes that a fraud was perpetrated but takes the position that a cloak of legal immunity protects it from all consequences of the fraud. After hearing, the rule granted on the defendants' petition was discharged.

The answer of Fidelity Trust Company to the defendants' interrogatory No. 7 highlights the ground for a just decision in this appeal. There the bank admitted that the documents which accompanied the note when discounted, were: the property loan application above referred to; a credit report, not in evidence; a carbon copy of the clipped original contract on which, without notice to, or consent of, the defendants the name Premier Insulation Sales had been stamped; and the so-called completion certificate set out above. Taken as a whole these documents not only spell fraud on the

defendants but they also charge the plaintiff with notice of the fraud which entitles the petitioners to relief. The original copy of the contract delivered to the bank, on its face, must have indicated on inspection that it had been tampered with after execution. Cf. *Standard Furnace Co. v. Roth,* 102 Pa. Superior Ct. 341, 347, 156 A. 600. The credit application, as we have indicated above, was inspired by Premier and for its benefit alone; there was no obligation on defendants to finance the instalment payments in any manner. And the representations made to these trusting defendants which induced them to sign the so-called credit application, also spell fraud. They were told that its purpose was "to get a better rate" . . . "a cheaper monthly rate". The real purpose was quite the opposite.

The note, by the confession contained in it, authorized the entry of judgment for the whole principal sum "at any time" and judgment was entered by the plaintiff on July 24, 1956, before any alleged default in defendants' obligation. The note therefore was non-negotiable, and, unless defendants are estopped, it is open to the same defenses which defendants would have had against Premier Insulation Sales. The assignee of a non-negotiable note takes it subject to all equities with which it was affected in the hands of the assignor and may not enforce payment unless the maker is estopped from asserting a defense. *Sprenger v. Litten,* 142 Pa. Superior Ct. 194, 198, 15 A. 2d 527; *Billings v. Roth,* 156 Pa. Superior Ct. 390, 40 A. 2d 910. In refusing to open judgment the lower court relied upon the principles of equitable estoppel as set forth in *U. S. Nat. Bk. in Johnstown v. Drabish,* 187 Pa. Superior Ct. 169, 144 A. 2d 640. However, the factual situation there was entirely different from that presented by the instant record. In that case, after entering into a written contract for the installation of a heating system, the defendants signed a written ap-

plication for credit and on the same day signed a separate judgment note, admitted to be used to raise money for payment of the contract price. Only after completion of the work did the defendant, Drabish, sign a completion certificate at the instance of the plaintiff bank. Here on the other hand the note signed by defendants on its face was incomplete when signed and was subsequently dated to coincide with the date of the completion certificate. Moreover, in the *Drabish* case there were no additional suspicious circumstances, such as here present, to put the plaintiff upon inquiry at the time it accepted plaintiff's note for discount.

The date appearing on the note is the date of the completion certificate quoted above, which was secured at a later time. Normally of course the note and application for credit would be executed on a date prior to the completion of the work—in fact even before the work was commenced, since under plaintiff's own theory the purpose of the loan application and note was to provide funds to pay for the work. Accordingly the fact that the note in the instant case bore the same date as the completion certificate of itself was such a significant irregularity as to put upon the bank the duty of inquiry. We are not impressed by the completion certificate. The defendants clearly were imposed upon when their signatures to it were obtained. And even on its face, under the circumstances it does not have the legal effect of a certificate of no defense to the note, in this action by the bank. Its purpose was to raise money for Premier and not for the benefit of the defendants. It is only where the purpose of the note, which the certificate of no defense accompanies, is to raise money by the sale of it *for the benefit of the original obligors* that they cannot defend against a purchaser for value without notice. *Standard Furnace Co. v. Roth,* 345, supra. Moreover, the bank in the preparation of its printed form on which the certificate appears

in this case, overstepped itself when it provided in effect that it, the plaintiff bank, should not be bound by any promise by the contractor or salesman made to the makers of the note that they *"will receive a cash bonus or commission on future sales as an inducement for the consummation of this transaction."* It is more than a coincidence that the bank specifically in this certificate sought to estop the defendants from asserting the very fraud relied upon by them as a defense to the note. By attempting to avoid the consequences of the fraud they admit knowledge of it. And the provision of the so-called certificate cannot be legally effective here, for the additional reason that a bank cannot absolve itself by contract from the consequences of fraud as to facts known to it, which tainted the obligation which it would enforce.

Under the facts here presented the defendants are entitled to the benefit of the legal rules governing Incomplete Instruments (Uniform Commercial Code of April 6, 1953, P. L. 3, 12 A. PS §3-115) and Alteration of Instruments (Uniform Commercial Code, 12A PS §3-407). Cf. *Smith v. Weld,* 2 Pa. 54; *McComsey v. McGowan,* 325 Pa. 484, 486, 190 A. 884. In our view, for the reasons above stated, the bank cannot claim as a matter of law that it was a bona fide holder, without actual or constructive notice of Premier's fraud. Defendants are entitled to have a jury pass upon the factual issues involved and raised in their petition to open the judgment; defendants' rule to open judgment should have been made absolute.

The order is reversed with a procedendo.