# United Consumer Discount Company of Ligonier v. Paulovich

*Gleason & Krumenacker*, for petitioners.

*Edward R. Schellhammer*, for respondent.

McDONALD, J., December 27, 1965.—This matter is before the court upon petition of defendants to open judgment confessed by plaintiff on a note which they executed to obtain a consumers' loan for the purchase of carpeting from a copartnership, known as Qualified Carpet Company (hereinafter referred to as "Qualified"). They contend plaintiff is not a holder in due course, and, therefore, they may assert against it defenses of fraud and failure of consideration.

On April 26, 1965, defendants executed a purchase order with Qualified for carpeting to be installed in their home. The inducement for this purchase, and without which it would not have been made, since husband-defendant was unemployed, was a "Customers Commission Agreement", exhibit no. 3, wherein Qualified agreed to pay defendants the sum of $50 for each name submitted as a prospect, whether a purchase was made or not, and an additional $50 for each prospect submitted by any of those whom defendants had named when that person purchased carpeting.

They were led to believe the carpeting could be paid for in this manner. On the same day, the security agreement and note, payable at United Acceptance Corporation of Ligonier, allied with plaintiff, were executed. The note was never discounted or returned to defendants.

On April 28, 1965, the carpeting was installed and that evening Adam Zubas, a partner in Qualified, called on defendants and explained the method of securing and submitting names for commission payments. He then drove them to Ligonier, where they met with Donald R. London, manager of plaintiff, and also United Acceptance Corporation of Ligonier. This was "late at night" and after plaintiff's business hours: Mr. London prepared, and signed by defendants, a "Customers Statement of Contract", which set forth the purchase price of the carpets, and in addition the sum of $645.70 as discount, service, insurance and recording charges. They also executed a note in the amount of $2,520, payable to plaintiff. A check was prepared by London, endorsed by husband-defendant, and turned over to Zubas. According to defendants, after the papers had been executed, husband-defendant asked London where to bring the commission payments which were to be made by Qualified. He was advised to send them directly to plaintiff, since, in the words of London, "You never know these people, they could be fly-by-night affair people".

Defendants prepared a list of 16 names, and actually contacted two prospects. No one called for the list, as had been promised, and telephone calls to Qualified were not answered. No address appears on any of the Qualified papers. Alarmed, defendants contacted Attorney Patrick Gleason, who wrote to Qualified and determined it had moved without leaving a forwarding address. Zubas and the representatives of Qualified have not been heard from since. The attorney also

wrote to plaintiff, denying liability on the note. It was after this that judgment was entered in the amount of $2,520.

On April 28, 1965, when Zubas called at defendants' home, wife-defendant complained about loops on the carpeting which were loose. He advised her this was a minor imperfection in the loom, and it could be corrected by merely cutting the loops. Exhibits nos. 2-A, B and C, photographs taken by defendants, indicate the imperfection was rather widespread. The carpeting has since been removed and stored.

It isn't difficult to conclude Qualified left the area on or about April 28, 1965, thus justifying the appellation of Mr. London that it was a "fly-by-night" concern. It is significant that one of the witnesses, Mrs. Doris Swindell, who had also purchased carpeting and complained to London that no commission payments were made, testified that Zubas, or a representative of Qualified, had left a $50 check at her home during her absence, and it was returned by the bank marked "account closed". It was dated April 28, 1965, the same date as defendants' loan.

Testimony offered by defendants indicates that other purchasers, as early as January 1965, and as late as April 14, 1965, had complained to London about the sales method of Qualified; i.e., that they were led to believe the carpeting would be paid for by commissions on names submitted under the "Customers Commisson Agreement"; the high rate of interest on the notes when it was learned they had been discounted by United Acceptance Corporation of Ligonier or plaintiff; and the failure of Qualified to pay the commissions agreed upon. It appears that Zubas, Robert Hudson, both partners of Qualified, and a man named Gerald Melady, had operated at least from January 1965, until March as "Associated Carpet Co." (hereinafter referred to as Associated). Thereafter, accord-

ing to Mrs. Antoinette Safina, Zubas said the name was changed because Melady "skipped town". Six of defendants' witnesses testified London had called them on the day the carpeting was installed (one said the call was a week later), and asked if they were satisfied. He did not discuss financing. Shortly thereafter, they received a payment book from either United Acceptance Corporation of Ligonier or plaintiff. This usually prompted an immediate call to London and a subsequent meeting with him.

These witnesses testified that at meetings with London, he referred to Associated or Qualified as "crooks", "shysters", and that they were "fly-by-night" concerns. Mrs. Mary Scalia met with London on April 12, and told him that Qualified had not paid commissions agreed upon, and he replied they must be "shysters", but he thought they would be around for a year. He advised her to work on the referrals and get her carpeting paid off. Mrs. Lura Mellott, at her meeting with him on April 14th, also attended by Mrs. Scalia, told him a news article had appeared in her area, Bedford County, critical of the carpeting agents then operating and warning persons to beware of purchases. Further, that there were rumors people in the Roaring Springs and Martinsburg areas of Blair County had been "taken", and that Qualified was not reliable. She said that he replied, "He thought they were shysters ... and you people aren't going to get hurt too bad because you are in on the ground floor. He said it was the ones on the end who are going to get hurt, but he said that they are going to be around here long enough that you will get some money out of them, he said even if it is only a couple hundred dollars it will pay your interest. ..."

London testified he is manager of United Acceptance Corporation of Ligonier and plaintiff, and that Qualified representatives had contacted his Pittsburgh office

to discount notes. He then talked to someone at Hollidaysburg Trust Company, and learned the three men, Melady, Hudson and Zubas, were from Chicago, had discounted $150,000 of notes with the Trust Company and that they had an excellent reputation. He said his firm began to discount notes and had no complaints until Qualified left the area. He admits some of the men in Qualified were with Associated when he processed loans. The loans were generally of the direct consumer discount type, although some were discounted through United Acceptance Corporation of Ligonier. At present, the firm has about 25 loans on its books. He denied he referred to the representatives of Associated or Qualified as "crooks" or "shysters", and he said he made an effort, unsuccessfully, to contact the person named in the newspaper article referred to by Mrs. Mellott. He does not favor the commission sales plan because the lending agency has no control over payments. He also admits in his experience this type of sales operation sometimes "go out of business". He said it was his practice to call purchasers, ascertain if they were satisfied with the carpeting, explain the financing arrangements, and advise them they were obligated to make payments regardless of commissions received. He said this was explained to defendants when their note was executed.

The modus operandi of Qualified, formerly Associated, is clear. It would move into an area and establish contact with a lending institution willing to discount its paper or to make direct loans. Having thus arranged for financing, the Qualified representatives would contact homeowners, and in order to sell the carpeting, make glowing promises that it could be paid for by commissions. They would secure a purchase order, security agreement and note, payable at United Acceptance Corporation of Ligonier. We assume, then, London would be notified by Zubas or Hudson, and he

would call the purchaser to ascertain if the carpeting was satisfactory. It is significant here, too, that the call usually occurred immediately upon installing the rug, and in one case even before it was installed.

We must assume London was aware of the modus operandi prior to April 28, 1965, since he had received complaints, and in particular that he was familiar with the customers' commission agreement. This agreement, which was the inducement for the purchases, would convince any unwary homeowner that in a very short time the cost of the carpeting could be paid for by commissions. An examination of its terms satisfies us no reputable firm which intended to remain in business could operate under it for long. We conclude Qualified never intended to remain in any area after its initial onslaught. As an experienced and astute businessman, London should have been aware of the pitfalls in this type of sales operation. It is obvious if only 10 sales were made in an area, and each purchaser submitted 15 names (Mrs. Safina said she submitted 25 to 30 names), Qualified was obligated to pay commissions of $7,500, and perhaps more if the names submitted by the initial prospects purchased carpeting. While there was no testimony of the number of sales made, we do know from London's testimony his firm had 25 accounts, and Hollidaysburg Trust Company was carrying $150,000 in Qualified or Associated paper. The number of prospects submitted by these purchasers, and the commission obligation of Qualified or Associated, must have been astronomical!

We have no difficulty in determining the sales transaction between Qualified and defendants was fraudulent. The entire operation in this area indicates its sole purpose was to fleece as many purchasers as possible in a short time and then abscond. Defendants may have been the last of the sheep fleeced by these clever operators. The failure of plaintiffs to call as its wit-

nesses the representatives of Qualified who had dealt with defendants, is an admission of fraud: Fidelity Trust Company v. Gardiner, 191 Pa. Superior Ct. 17, 24. Thus, as against Qualified, defendants have shown a meritorious defense.

Whether there was a failure of consideration is not so clear. The photo exhibits indicate imperfections in the carpeting. There is no positive testimony it is of an inferior quality. Examination by an expert may disclose that it fails to conform to the representations made by Qualified. However, if this is to be a meritorious defense, it will be necessary to produce more evidence the carpeting did not conform to its specifications. This, particularly so, in view of Mrs. Paulovich's apparent satisfaction for a period of several days after installation.

The troublesome question here is whether the defense against the seller may be asserted against plaintiff who made a direct loan. We must bear in mind that the free negotiability of notes and other evidences of indebtedness is a necessary requisite in modern financing. One who discounts an instrument or makes a direct loan is not a guarantor of the quality of the goods purchased, or subject to any other defense between the maker and the payee, unless there is a lack of good faith on the part of the endorsee. When plaintiff is payee, as in this case, and the loan is direct to the purchaser of goods, rather than by a payee's endorsement, the same considerations must prevail.

A payee may be a holder in due course: Act of April 6, 1953, P. L. 3, sec. 3-302 (2), as amended, 12A PS §3-302. Plaintiff, as payee, contends it is a holder in due course and entitled to the protection of that status accorded by the commercial laws of this Commonwealth: Act of 1953, supra, sec. 3-305. In other words, that it has taken the note upon which judgment was entered, free from all defenses of the maker, since it

had complied with section 3-302 by accepting the note for value in good faith and without notice of any defense.

There can be no doubt plaintiff gave value when it turned over to defendants a check in the amount of the purchase, and said check was endorsed to Qualified. However, did plaintiff act in good faith and without notice of a defense? As to the latter, there is no testimony London actually knew Qualified was going to abscond and breach the commission sales agreement. However, testimony offered by defendants and their witnesses, if believed, raises serious question of plaintiff's good faith in accepting the note and making the loan.

From January until two weeks before the execution of defendants' note, irate purchasers had numerous discussions with London. Contrary to his testimony that no complaints were received prior to the time Qualified left the area, we conclude there is sufficient notice that homeowners in the area were being subjected to a sales scheme which he knew, or should have known, would eventually collapse, causing hurt to someone.

There is no doubt Qualified and London, as manager of plaintiff, worked in close harmony. When a sale was made and carpeting installed, London would call the purchaser on the day of installation and ascertain if it was satisfactory. He made himself available, whether during business hours or not, to facilitate execution of the papers and, as indicated in the testimony of Doris Swindell, even traveled to their home in the Bedford area at 10 p.m. to refinance the original note which had been assigned to United Acceptance Corporation of Ligonier. It is significant, and certainly illustrative, of the close association between Qualified and plaintiff that when Mrs. Antoinette Safina complained she had not received commissions from Associated,

Qualified's predecessor, London told her he would hold up on other notes unless she did receive that money. Shortly thereafter, she received a part payment on her commissions.

In our view, the very scheme of operations to anyone in the business of financing consumer purchases, if not to the gullible homeowners, should have been as much a warning of fraud as a red light at a railroad crossing. A businessman as astute, experienced and intelligent as London, with the complaints he had received from January until April, and the close association he had with Qualified, should have known the customers' commission sales agreement was unworkable, and anyone employing it would have to go out of business when commission demands began to pyramid in a particular area.

Is there sufficient evidence of lack of good faith on the part of plaintiff to require a jury determination? We think there is. Mere negligence in negotiating an instrument is not bad faith. Bad faith is dishonest and willful. "The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith (Union Bank & Trust Company v. Girard Trust Company, 307 Pa. 488, 500, 501), unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears": Davis, Trustee v. Pennsylvania Company, 337 Pa. 456. Actual bad faith must be proved: Union Bank & Trust Co. v. Girard Trust Co., 307 Pa. 488.

We conclude that long before defendants purchased the carpet and executed the note, there were circumstances far stronger than mere suspicion of fraud which should have excited the inquiry of a prudent man. The complaints brought to the attention of Lon-

don by witnesses whose testimony we consider credible, when cumulated, were convincing evidence the persons with whom he was dealing were engaged in a fraudulent sales operation. We are satisfied from statements made to witnesses that he was aware of the unreliability of Qualified, and if not actually aware of the inherent fraud in its operations, we conclude his failure to make inquiry was motivated by a fear or belief such inquiry would have disclosed the vice.

The facts here are similar to those in Norman v. World Wide Distributors, Inc., 202 Pa. Superior Ct. 53, although in that case, the lending institution was endorsee of a note obtained by fraud. Norman held that one who seeks protection as a holder in due course must have dealt fairly and honestly in acquiring the instrument, and when there is a failure to make inquiry as to the rights of prior parties because such inquiry would disclose a vice or defect in the title, that person is not a holder in due course. See also Stroudsburg Security Trust Company Case, 145 Pa. Superior Ct. 44, and Fehr v. Campbell, 288 Pa. 549.

Here, plaintiff had a duty to inquire into the operations of Qualified, and not to continue discounting notes or making loans with tongue in cheek and eyes closed to that which was obvious. Nor will the status of payee on a direct loan protect plaintiff. To be a holder in due course it is necessary to meet the requirements of section 3-302 of the Uniform Commercial Code, including that of good faith. When, as here, the defense of fraud appears to be meritorious, the burden is on the one claiming as a holder in due course to prove that status: Norman v. World Wide Distributors, Inc., supra; Budget Charge Accounts, Inc. v. Mullaney, 187 Pa. Superior Ct. 190, 193.

The evidence of lack of good faith is so convincing, we are of the opinion the factual issues raised must be submitted to a jury: Budget Charge Accounts, supra.

ORDER

Now, December 27, 1965, after hearing and upon consideration of the testimony and briefs, the prayer of the petition of defendants is hereby granted, and the judgment of United Consumer Discount Company of Ligonier v. Dewey Paulovich and Anna M. Paulovich, husband and wife, entered to June term, 1965, no. 724, is hereby opened, and defendants are allowed to enter a defense thereto.