VON FRANK ET AL. *v.* THE HERSHEY
NATIONAL BANK

[No. 276, September Term, 1972.]

*Decided May 21, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Peter J. Messitte* for appellants.

*Kelley Litteral*, with whom was *Kenneth Edmunds* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

The appellee, The Hershey National Bank, a Pennsylvania financial institution, as payee of two notes both dated in 1969 and under seal, each having a face value of $10,000, caused a judgment by confession to be entered in the Circuit Court for Montgomery County in October 1971 for the full amount of the notes, interest and attorneys' fees, all as authorized by the terms of the notes. The appellants, James von Frank and Joseph Barrett, filed a timely motion under Maryland Rule 645 to vacate that judgment on the grounds that the notes were ambiguous on their faces and there had been unauthorized alteration. Following a hearing on the motion, the judgment was vacated, although any lien under it was retained, and the case was then set for a trial on the merits. At that trial, Judge Joseph M. Mathias, sitting without a jury, found the appellants personally liable on the notes and entered judgment against them. This appeal followed.

Settlement of the dispute here requires an examination of the understanding between the parties respecting the liability of the appellants and a determination of whether any subsequent action by the Bank impermissibly altered their arrangement. Appellants contend that they signed these notes in a representative capacity and no individual liability was intended. The Bank, of course, sees it otherwise and posits that appellants were personally responsible. Judge Mathias agreed with the Bank and found that:

"[There is] no evidence offered to show that [appellee] altered the note. The evidence indicates as a matter of fact that all the bank did was to enter the dates on the notes and to put the check numbers in the lower left corner thereof.

\* \* \*

Both [appellants] are men experienced in the ways of banking and business. The notes which they signed show on their face thereof that [they] signed as co-makers. When there is no designation on a note that a person signs in a representative capacity, this is prima facie indication that he signed in his own individual capacity, and it is up to him to show that he signed otherwise.

\* \* \*

This Court will not invalidate these written instruments on the uncorroborated testimony of these two [appellants] who obviously have a stake in this proceeding.

We simply do not accept their testimony in view of what we regard as convincing testimony to the contrary, that the bank intended to rely for repayment of its $20,000 loan on the security of these [appellants] and that [they] signed as co-makers and did so knowingly and that one of [them] even as late as' July 1970 admitted he and his co-[appellant] signed as co-makers." [1]

---

1. Judge Mathias is apparently alluding to an agreement of sale of the two radio stations for which this money was borrowed to launch. The agreement, dated July 8, 1970 and signed by Joseph Barrett, makes reference to these notes and characterizes appellants as "co-signers."

Upon careful review of all the evidence in the record, we cannot say that the trial judge was clearly in error in reaching the conclusions he did. Therefore, we must affirm the judgment. Rule 886.

This litigation concerns the liability of the appellants on two notes, one dated May 1, 1969, the other, June 10 of that year. The note of May 1 reads:

The June 10 note is identical except for the date and the fact that the signature of Stanley Stoller (S. S. Stoller) appears only once, as president of the corporation, and does not appear below the attestation line and to the left of the other signatures.

The facts leading up to the execution of these notes can be narrated as follows: in November 1968 the appellants, together with Stanley S. Stoller, met in Hershey, Pennsylvania, with a representative of Hershey Estates Corporation to discuss the purchase by appellants and Stoller of two radio stations owned by a wholly owned subsidiary of that corporation. These negotiations apparently proceeded so well that, at the conclusion of the meeting, arrangements were made for the prospective purchasers to meet with John Baum, vice president and cashier of the Hershey National Bank. The purpose of this meeting was to discuss the prospects of obtaining a bank loan of $20,000 for the East Penn Broadcasting Corporation, a company to be newly organized, owned, directed and

administered by appellants and Stoller. This money was necessary in order to fulfill a Federal Communications Commission requirement for a license transfer. At this initial bank meeting, Baum testified that he informed the purchasers that no funds could be loaned to their new corporation unless they were personally responsible for the indebtedness. Additionally, he informed them that their personal financial statements would be required before the Bank would further consider the loan. This request for financial statements was complied with and Barrett, a Washington stockbroker, and von Frank, then president of a Maryland bank, supplied detailed statements showing their net worth. Stoller supplied a statement which in Baum's words, "was such that the [Bank] couldn't have relied on his personal net worth." East Penn never filed a financial statement.

Apparently satisfied that the appellants' financial statements justified the loan, the Bank notified East Penn, through its president, Stoller, that it had an approved line of credit for $20,000. At this point we should mention that Barrett and von Frank are both residents of Bethesda, Maryland, while Stoller was the man on the scene in Pennsylvania. It is probably because of the inconvenience to appellants of having to travel to Pennsylvania that appellee was made aware of a corporate resolution that authorized Stoller, as president of East Penn, to sign a valid corporate obligation on his signature alone.

Finally, in April of 1969, East Penn was ready to draw on its line of credit. Stoller so informed the Bank and obtained the printed form that was to become the May 1, 1969 note in order to have it properly signed by the appellants. Stoller met appellants one night at a restaurant in Bethesda where the signing ceremony took place. Barrett and von Frank both claim that the printed note form they signed that night did not have on it the words "president", "seal", or "sec'y"; but that they instructed Stoller to add their respective corporate titles after their names. The appellants make the same contention about the July 10 note which they say they signed in blank when they received it in the mail and then returned it to Stoller. No explanation is offered by these

signators as to why they did not place so important a detail, as they understood the addition of the corporate office to be, on the notes themselves while they had pen in hand. The trial judge found that each note, when presented to the Bank and as received in evidence, was complete and no additions were made except to date them and place the Bank number in the lower left hand corner.

The East Penn investment did not prove successful and by January 1970 the interest due on the notes was in default. The Bank made demand on the appellants that they honor their obligation as co-makers and when they still did not pay, this suit was instituted. Appellants resist the Bank's claim on the grounds that they are not personally liable on the notes, arguing that the provisions of the Uniform Commercial Code, Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, compel such a result. They rely on sections 3-115, 3-407, and 3-606 to support their contention. They argue that, under § 3-115, the instrument, when signed, was incomplete and therefore when it was completed in a manner not authorized, § 3-407 dealing with alteration then became applicable. They suggest that, since the "authority given" was to accept a note with three signatures, the Bank's acceptance of only two is a material alteration which releases them from liability. Appellants claim that the same result is required by § 3-606, since by discharging Stoller from liability the Bank has impaired appellants' right of recourse against him. Under the view we take of this case, it is unnecessary to decide these issues; but, we hasten to add that if called upon to decide them we would not accept appellants' positions.

The parties have proceeded throughout this litigation on the assumption that these notes were negotiable and therefore governed by the provisions of the U.C.C. We find the notes to be non-negotiable and the U.C.C. to be inapplicable. Therefore, the liability of the parties is determined as a matter of simple contract law. *See* Code (1957, 1964 Repl. Vol.), Art. 95B, §§ 1-103, 3-805 Official Comments. *Cf. Vain v. Gordon*, 249 Md. 134, 136, 238 A. 2d 872 (1968); *Roth v. Baltimore Trust Co.*, 161 Md. 340, 348, 158 A.

32 (1931). We also note that, although the U.C.C. has been adopted in both Maryland and Pennsylvania, the parties here proceeded on the assumption that the law of Maryland and not that of Pennsylvania was applicable. However, from the record, it would seem that the law of Pennsylvania would govern this transaction. But, as no notice was given of an intention to rely on Pennsylvania law, and there was no waiver of the requirement, pursuant to Code (1957, 1971 Repl. Vol.), Art. 35, § 50, we are not required to take judicial notice of the law of that state other than to presume it is like that of Maryland. *Coppage v. Resolute Insur. Co.*, 264 Md. 261, 269, 285 A. 2d 626 (1972).

Under the Maryland U.C.C., to be negotiable, an instrument must, among other requirements, "be payable to order or to bearer." § 3-104 (1) (d). The absence of these magic words renders a note non-negotiable. Here, the notes in question contain just a "promise to pay to the Hershey National Bank" the amount due. However, § 3-805 entitled "instruments not payable to order or to bearer" specifies that:

> "This subtitle *applies* to any instrument whose terms do not include transfer and *which is otherwise negotiable within this subtitle* but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument." (Emphasis added.)

The official comments to this section indicate that:

> "This section covers the 'non-negotiable instrument.' As it has been used by most courts, this term has been a technical one of art. It does not refer to a writing, such as a note containing an express condition, which is not negotiable and is entirely outside of the scope of this Subtitle and to be treated as a simple contract. It refers to a particular type of instrument which meets all requirements as to form of a negotiable instrument except that it is not payable to order or to bearer."

Thus, while these notes could still be governed by the Code

even though they lack words of negotiability, they must meet all other "requirements as to form of a negotiable instrument" except for that. The notes here do not conform to this standard. The U.C.C., § 3-112 (1) (d) provides that the negotiability of an instrument is not affected by "a term authorizing confession of judgment on the instrument if it is not paid when due." We held in *Stankovich v. Lehman*, 230 Md. 426, 187 A. 2d 309 (1963), a case decided under the Negotiable Instruments Act, that the authorization to confess judgment "as of any term" permitted entry of judgment at any time prior to the maturity of the note and therefore destroyed negotiability. As was stated by Judge Hammond for this Court in *Stankovich, supra* at 430:

> "It would seem logical that if the statute, as it does, preserves negotiability only if the confession of judgment is at or after maturity, the warrant to confess must expressly, or by necessary implication, restrict its exercise to that time if the note is to be negotiable, and that if the warrant is silent as to the time when it can be exercised, the reasonable implication must be that it can be done at any time. Most of the cases involving this general area of the law have arisen in Pennsylvania, and the Courts of that State have held that notes containing stipulations for confession of judgment without specification or limitation as to time are, like those expressly authorizing judgment prior to maturity, non-negotiable."

We held in *Vain v. Gordon, supra,* 249 Md. at 136, that the U.C.C. has not changed the law on this point. The notes here being silent on the time when confession of judgment can occur must be read to mean that it can be done at any time and therefore they are non-negotiable.

It is significant, and somewhat ironic, that the authorities relied on by this Court in *Stankovich* and *Vain* are Pennsylvania cases. They have likewise held that the U.C.C. has not changed the law and continue to hold that a provision of a note authorizing confession of judgment before it is due, such as we have here, renders it

non-negotiable. *Smith v. Lenchner*, 204 Pa. Super. 500, 205 A. 2d 626 (1964); *Fidelity Trust Co. v. Gardiner*, 191 Pa. Super. 17, 155 A. 2d 405 (1959); *United States National Bank in Johnstown v. Drabish*, 187 Pa. Super. 169, 144 A. 2d 640 (1958); *Bittner v. McGrath*, 186 Pa. Super. 477, 142 A. 2d 323 (1958). This rule has been applied to demand notes. *Smith v. Lenchner, supra; Miners' State Bank v. Auksztokalnis*, 283 Pa. 18, 128 A. 726 (1925). In comparing the language of the notes here to that of other notes determined to be non-negotiable, we have found marked similarity. *Miners' State Bank v. Auksztokalnis, supra; Lester, to use of Laurelton State Bank v. Kleckner*, 5 Pa. Dist. & Co. Rep. 342 (1924).

Since these non-negotiable notes are not governed by the U.C.C., their effect is, as already noted, determined under principles of simple contract law. Under that law, appellants cannot escape personal liability. Although the corporation, as principal, was fully disclosed, its agents would not be insulated from liability if there was an agreement between the parties that the appellants would be so liable. *A.S. Abell Co. v. Skeen*, 265 Md. 53, 56, 288 A. 2d 596 (1972), and cases cited therein. In *Haile v. Peirce*, 32 Md. 327, 331-32 (1870), the Court said:

> "[S]ometimes the agent may attach to his signature the character in which he signs the instrument, without any correspondent, or other description, in the body of the note — or he may, in the body of the instrument, disclose the name of his principal and sign his own individual name, without any additional description whatever — or he may sign his own name, without apt terms to charge himself, and in the body of the note, use doubtful expressions to describe the principal, leaving the precise meaning of the instrument to be gathered from the terms on its face, so ambiguous or obscure as to render its interpretation *per se*, too difficult and uncertain for just and sound construction.
>
> When the note is of this last description, that is,

where its language or its terms are so unintelligible as to admit of no rational interpretation of the meaning, or are not sufficiently decisive of the intention of the parties, but on the contrary, are equivocal and uncertain; extraneous proof, as between the original parties, may be admitted to show the true character of the instrument, and what party, — the principal, or the agent, or both, is liable.

Where individuals subscribe their proper names to a promissory note, *prima facie*, they are personally liable, though they add a description of the character in which the note is given, but such presumption of liability may be rebutted, as between the original parties, by proof, that the note was in fact given by the makers, as agents, with the payee's knowledge."

At best from appellants' standpoint, the appearance of the name of the corporation before their signatures renders the capacity in which they signed ambiguous [2] and this permits "extraneous proof, as between the original parties, to show the true character of the instrument, and what party — the principal, or agent, or both — is liable." *Haile v. Peirce, supra.* And, when there is legally sufficient evidence to support the claim, the factual issue of whether there was an understanding between the parties that the signature was to be in a representative or personal capacity is for the trier of fact. *Belmont Dairy Co. v. Thrasher,* 124 Md. 320, 92 A. 766 (1914). Here, the evidence is clear, as found by the trial judge, that individual liability was intended. Even if the Bank originally demanded three signatures, nothing was shown that would prevent it from changing its mind and accepting two. The Bank was presented with a note by the corporation's president, who had authority to bind the corporation on his signature alone and, therefore, if the individual liability of the other two signers was not

---

**2.** We note that under the U.C.C., Code (1957, 1964 Repl. Vol.), Art. 95B, § 3-402, a signature on an instrument which does not clearly indicate it is made in some other capacity is an indorsement.

contemplated, their signatures would have been unnecessary. While the appellee had originally indicated that it wanted the safeguard of the personal liability of these three corporate organizers, it agreed to accept the note as presented and look to the appellants for satisfaction of the debt if the corporation defaulted. The Bank could do this and waive its original requirement of three personal signatures and appellants cannot now seek refuge under the shelter of that requirement designed to protect the Bank. Of course, a different situation would be presented if these three individuals had informed the Bank that any one, or more, of them would not be bound unless all three assumed the same liability and the Bank in making the loan, disregarded that directive. But there is no evidence showing this to be the case here.

The appellants raise one more point in their quest for reversal. They argue that the trial court erred in its finding as a fact that the Bank was not controlled by Hershey Estates in its conduct in regard to this transaction. This error, they claim, was prejudicial because it prohibited them from showing that Hershey Estates was so anxious to rid itself of these radio stations and offered such generous terms of sale to these purchasers that it would then be illogical for them to expect that the appellee, allegedly controlled by Hershey Estates, would be so strict as to require personal liability. After listening to all of the testimony the appellants had to offer on this point, Judge Mathias concluded that "there is no evidence ... that indicates that the Hershey Estate Corporation exercised any dominion and control over the Hershey National Bank with respect to this particular transaction." With this finding, evidence relating to the reason for selling the radio stations and how generous the terms of sale were, was irrelevant and properly excluded. We have carefully reviewed all of this evidence and we find no basis for concluding any differently than did the trial judge.

In sum, we think that the trial court correctly found the appellants personally liable on these notes and will affirm its judgment.

*Judgment affirmed.*

*Costs to be paid by appellants.*