SECURITIES & EXCHANGE
COMMISSION

v.

INVESTORS SECURITY CORPORA-
TION and William H. Brown.

SECURITIES & EXCHANGE
COMMISSION

v.

INVESTORS SECURITY LEASING
CORPORATION, et al.

Civ. A. Nos. 75–1036, 75–1304.

United States District Court,
W. D. Pennsylvania.

June 17, 1976.

Thomas H. Monahan, SEC, Philadelphia, Pa., for plaintiff.

David A. McVey, Stevens, Clark, Laubach & Semple, Pittsburgh, Pa., for trustee of defendant: Investors Security Corp.

Alan Lefkowitz, Kaplan, Finkel, Lefkowitz, Roth & Ostrow, Pittsburgh, Pa., for receiver of defendant: Investors Security Leasing Corp.

James McLaughlin, Mcardle, McLaughlin & McVay, Pittsburgh, Pa., for defendant: William H. Brown.

John Doherty, William Manifesto, DeCello, Bua & Manifesto, Pittsburgh, Pa., for defendants: Dale McDonald and William Lynam.

Hurd Baruch, McCann, Garland, Ridell & Burke, Pittsburgh, Pa., for Equibank, N.A.

Theodore Focht, Washington, D. C., for Security Investors Protection Corp.

## OPINION

SNYDER, District Judge.

This Court is presently concerned with twelve of some one hundred and eighty-three brokerage accounts representing about $100,000.00 of $2,000,000.00 of securities taken in by brokers and their agents, on which the securities owners may incur staggering losses through hypothecation of stock for personal ventures in "get rich quick" schemes.

Equibank, N.A. proposes to sell securities valued in excess of $100,000.00 which were pledged as collateral for personal loans, now of a balance in excess of $50,000.00, it extended to William H. Brown, the President of Investors Security Corporation (ISC) and the Vice-President and Treasurer of Investors Security Leasing Corporation (ISLC). The Trustee for the liquidation of ISC and the Receiver for ISLC sought to enjoin the Bank's proposed sale. A preliminary injunction was granted and after extensive hearings, we now make the injunction permanent.

## I. THE PLEADING BACKGROUND.

### A. INVESTORS SECURITY CORPORATION.

On August 15, 1975, the Securities and Exchange Commission (SEC) sought a temporary restraining order and a permanent injunction against ISC and Brown because of violations of the Securities Exchange Act of 1934 and of the regulations promulgated thereunder.[1] The Complaint charged that Brown and ISC,[2] effected securities transactions and induced and attempted to induce the purchase and sale of securities when its aggregate indebtedness exceeded its net capital by more than the permissible maximum. The Complaint also charged inter alia that ISC failed to maintain accurate

---

1. Securities Exchange Act of 1934, 48 Stat. 881, §§ 15(c)(3) and 17(a), 15 U.S.C. §§ 78o (c)(3) and 78q(a), as amended, and Rules 15c3–1, 17a–3, and 17a–11, 17 CFR §§ 240, 15c3–1, 240.17a–3, and 240.17a–11. The SEC's authority to bring the action is set forth in 15 U.S.C.

§ 78u(e). The Court's jurisdiction over the action is conferred by 15 U.S.C. § 78aa.

2. Member of the P.B.W. Stock Exchange, Inc., a national securities exchange registered with the SEC, and of the National Association of Securities Dealers.

records, ledgers, etc., and failed to give notice that its net capital was less than the minimum required.

The Court entered a Consent Order prohibiting the removal or alteration of any securities, cash, assets, books and similar documents in ISC's 'possession or control pending the scheduled hearing on the preliminary injunction request.

On August 18, 1975, with the consent of Brown and ISC, the Court entered a permanent injunction prohibiting Brown or any other person on behalf of ISC from future violations of the 1934 Act, the regulations thereunder, and the P.B.W. Stock Exchange regulations. The Defendants were directed to employ a special fiscal agent to review the accuracy of customers' accounts held by ISC, and the Court retained jurisdiction for further action.

On September 15, 1975, the Securities Investor Protection Corporation (SIPC), a non-profit corporation created by the Securities Investor Protection Act of 1970 (15 U.S.C. §§ 78aaa, et seq., in which ISC holds membership, filed a Memorandum and Application for Protective Adjudication against ISC to declare ISC's customers to be in need of the Act's protection since ISC, as a broker-dealer, was in danger of failing to meet its obligations.[3] SIPC also requested inter alia that the Court appoint a Trustee for the liquidation of ISC; enjoin creditors for twenty-one days from enforcing non-preferential liens and pledges against

ISC and from exercising the set-off of debts under Section 68 of the Bankruptcy Act; and enjoin the disposal or withdrawal of any assets or property of ISC.[4] SIPC's Application and the SEC's action were combined with the latter's consent as is provided for by statute.[5]

Following a hearing at which all parties were represented, the Court, with the consent of the SEC and without objection by ISC, granted SIPC's Application in toto, specifically including in the Order that:

all creditors of the defendant (ISC), and all other persons, firms and other corporations . . . be, and they hereby are, stayed, enjoined and restrained from commencing, prosecuting, continuing, or enforcing any suit or action or proceeding of any kind against the defendant (ISC), or against the trustee appointed herein, without first obtaining an order of this Court. . . .

The Trustee subsequently filed an application and received an order directing the publication of notice of the proceedings under the 1970 Act against ISC and fixing the time within which to file claims against the corporation, and for consideration of certain other matters.[6]

## B. INVESTORS SECURITY LEASING CORPORATION.

On October 10, 1975, the SEC filed a Complaint against Investors Security Leas-

---

**3.** § 5(a)(2) of the Act, 15 U.S.C. § 78eee(a)(2), authorizes SIPC's action and confers this Court's jurisdiction. The Court may enter a Protective Adjudication upon finding one or more of the conditions enumerated in § 5(b)(1)(A), 15 U.S.C. § 78eee(b)(1)(A).

**4.** SIPC's requested relief refers to specific provisions of the 1970 Act, see 15 U.S.C. §§ 78eee(b)(2) and (3) and 78fff(c)(1).

**5.** 15 U.S.C. § 78eee(a)(3)(A).

**6.** The Order specifically fixed the time and date of the first meeting of creditors and for hearing on the Trustee's (and his counsel's) disinterestedness, and further ordered: That notice of the commencement of liquidation proceedings and of the times of the above meetings be published in specified newspapers; that notice be sent to

each customer appearing in the records of ISC; that claims of customers be filed within 60 days of such notice; that notice be sent to certain other broker-dealers; that all creditors file formal proofs of claim within 6 months, except as provided in Bankruptcy Rule 302(e); that the Trustee may deem claims filed between 60 days and 6 months after the order to be timely filed; that no claim shall be allowed if filed after 6 months without further Order of the Court; that the Trustee investigate the financial condition and operations of ISC and report; that ISC comply with Bankruptcy Rule 402 and inform the Trustee of any attempt by its creditors to evade the provisions of either SIPA or the Bankruptcy Act; and that all matters except those specifically reserved be referred to a Bankruptcy Judge.

ing Corporation (ISLC), its President, Dale R. McDonald, its Vice-President, William H. Brown, and its Treasurer, William J. Lynam, seeking a permanent injunction against the Defendants for violations of the registration and anti-fraud provisions of the Securities Act of 1933, of the Securities Exchange Act of 1934, and of the rules thereunder.[7] With the Complaint were filed the Affidavit of the SEC Hearing Officer who had investigated ISLC, Motions for a Temporary Restraining Order, for a Preliminary Injunction, for the Appointment of a Temporary Receiver, and for the freezing of all Defendants' assets.

After hearing, the Court entered a Temporary Restraining Order and, after further hearing, a Permanent Injunction was granted against those practices of the Defendants found to violate the registration and anti-fraud provisions of the Acts and the Regulations. The Court ordered the appointment of a Receiver and froze all the Defendants' assets, stating:

> That the defendant Investors Security Leasing Corporation, its officers, directors, agents, servants, employees, successors and assigns, and William H. Brown, Dale R. McDonald and William J. Lynam and their agents, servants, employees, successors and assigns, and each of them hereby are restrained from directly or indirectly transferring, selling off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of or withdrawing any assets or property of defendants Investors Security Leasing Corporation, William H. Brown, Dale R. McDonald and William J. Lynam.

The Court also approved the Receiver's Petition to retain an accountant.[8]

**7.** The Complaint specifically cited the Securities Act of 1933, 48 Stat. 74, §§ 5(a) and (c), and 17(a), 15 U.S.C. §§ 77e(a) and (c), and 77q(a); the Securities Exchange Act of 1934, 48 Stat. 881, § 10(b), 15 U.S.C. § 78j(b), as amended; and Rule 10b–5, 17 CFR 240.10b–5.

**8.** The Court also subsequently approved stipulations between counsel concerning the filing of Brown's Affidavit listing personal assets and the clarification of assets not subject to the

## II. THE INSTANT PROCEEDINGS.

On December 10, 1975, ISLC's Receiver filed with his Court, and the Trustee in Liquidation of ISC filed with the Bankruptcy Judge, Petitions to enjoin Equibank's proposed sale of securities pledged by Brown as collateral for personal loans extended to him. These Petitions were consolidated in the District Court proceedings.

The Receiver's Petition refers to the actions against ISC and the bankruptcy adjudication against ISLC, and set forth a letter from Equibank in which it acknowledges that it holds securities hypothecated by James W. Thompson and Helen I. Thompson, his wife, and by Francis Calig and Valetta B. Beltz, to collateralize a personal loan to Brown, and that it intends to liquidate the securities to satisfy Brown's indebtedness to it in the sum of $47,946.55 plus interest. Equibank indicates in the letter that it deems itself unaffected by the orders entered in the actions against Brown and the corporations, as it concludes that the securities never were assets of ISC or ISLC and that it is a secured creditor of Brown's, not an "agent, servant, employee, successor or assign." The Receiver contends that the individuals whose securities were hypothecated, "appear as customers" of ISC and/or ISLC, and states that irreparable harm might result either to ISLC or to the individuals whose securities are in the Bank's possession, if the securities were to be sold, but that enjoining the sale of said securities would not harm the bank.[9]

The Trustee's Petition contains allegations similar to those of the Receiver and in addition contains statements that a Trustee appointed under the Securities Investors Protection Act succeeds to the same rights

freeze, i. e., an account containing a $665.00 educational loan to defendant Lynam's daughter, and any salary Brown received from business activity not prohibited by the Court's Order.

**9.** The Receiver's Petition was amended to include securities in the names of Edna Beringer, Robert Wilkin, M. Elizabeth Groom and Elsie Mae Roenigk.

as a Trustee in Bankruptcy and a Trustee under Chapter X of the Bankruptcy Act to avoid preferences and that under Section 70 of that Act he is vested with the title of the Bankrupt as of the date of the filing of the Petition. The Trustee points out that all creditors of ISC and all other persons are enjoined for ninety days from October 2, 1975 [10] from enforcing valid nonpreferential liens pledged against ISC's property and from exercising the set-off debts under Section 68 of the Bankruptcy Act, and that he has an affirmative obligation under the Securities Investors Protection Act to return to the customer "specifically identifiable property", 15 U.S.C. § 78fff(c)(2)(C). The Trustee states that some of ISC's customers have filed proofs of claim with him for securities which are held by the Bank and which may be, in fact, ISC's property. The Trustee requests injunctive relief similar to that sought by the Receiver.

On December 10, 1975, this Court consolidated the Petitions of the Trustee for ISC and the Receiver for ISLC and scheduled a hearing for January 5, 1976. This hearing on the preliminary injunction lasted for three days, during which time the Receiver was granted leave to amend his Petition to include additional third party securities held by the Bank which also were hypothecated by the registered owners and used to collateralize personal loans to Brown. The Receiver charged that these additional securities were delivered by their holders to ISLC and subsequently were pledged to Equibank unlawfully and without the authority of ISLC or the owners. The Receiver asserts that the pledge was part of a fraudulent scheme that "included forgery", and, therefore, any transfer of the securities to or by the Bank is wrongful to the Receiver, and that the Bank as pledgee of the securities as collateral against a personal loan, accepted the securities in bad faith and participated in the conversion of the securities under circumstances in which it knew or should have known of the adverse claims.

The Trustee, during this hearing, moved the Court to allow withdrawal of its Petition for injunctive relief against Equibank's proposed sale. The Trustee asserted that the Petition had been filed as an "immediate and necessary response" to the Bank's proposed action since the exact nature of the transactions between Brown and the Bank was not known at that time. ISC's Trustee further asserted that subsequent examination of documents relating to the loans and to the hypothecation agreements led him to conclude that as Trustee for ISC, he had no *in rem* claim against the specific securities held by Equibank and "that an attempt by him [to support his claim] would unnecessarily dissipate the assets of the estate for which he is trustee." [11] The Court orally denied the Trustee's Motion, but indicated it would be considered as on-going and might be granted at some future date.

After hearing on January 9, 1976, the Court, upon finding the prerequisites for injunctive relief, preliminarily enjoined Equibank from selling, transferring, etc., the securities.[12] The Order directed the Bank not to dispose of securities in the names of certain registered holders which it held as collateral for Brown's obligations; that it not dispose of certain municipal bonds held as collateral for Brown's loan; that it surrender to ISLC's Receiver, the securities registered in the name of Edna Beringer, Trustee; that it surrender to the Trustee of ISC the securities registered in the names of H. L. Calig, Trustee, Mary Kennan, Trustee, Mary Kennan, and Albert and Malkie Debo; and that certain hypoth-

---

**10.** Refer to this Court's Order dated September 15, 1975 and the October 2, 1975 Order of the Bankruptcy Judge extending for ninety days the restraint upon the enforcement of liens and pledges.

**11.** The Petition also indicates that the Trustee's withdrawal of his request for injunctive relief against the Bank would not affect any of the rights that might stem from the transactions here under scrutiny as ISC might also have *in personam* claims against Equibank resulting from any general creditor claims against ISC arising from these transactions.

**12.** See Appendix A to this Opinion.

ecation agreements be cancelled [13] and be retained by the Bank.[14]

The Court held a hearing on the Request for Permanent Injunction, after which counsel for the parties and for the Thompsons submitted memoranda. The Court conducted a further hearing at which the Thompsons' counsel presented and then orally withdrew a Petition for Allowance of Further Testimony. The Court, pursuant to Motions submitted and argued at the hearing, ordered release of certain property. We now have for decision the question of enjoining Equibank's disposal of its collateral.

### III. THE MODUS OPERANDI.

A brief recital of the method of operation is essential for Equibank holds the securities of a face value of $56,000.00 of the Thompsons as collateral on a note of William H. Brown (a renewal of prior obligations) dated July 11, 1974 in the amount of $102,946.55 (reduced by payments to a balance now of $47,946.55).

Accounts for ISC and Brown were initiated by inquiry from Brown in February of 1971 and various loans were made to ISC. Finally, on September 14, 1971, the initial loan to Brown (as distinguished from Brown borrowing for ISC) was made for $37,500.00 collateralized by Thompson's securities.

From the undisputed testimony we learn that in the early part of September, 1971, James Thompson and his wife, Helen, turned over to William H. Brown securities of the value in excess of $325,000.00 (T. 282).[15] The securities now held by Equibank [16] and proposed to be sold were for the most part covered by a letter which reads as follows:

I, James W. Thompson, hereby authorize William H. Brown of 5710 King of Arms Drive, Gibsonia, Pennsylvania 15044 to pledge and hypothecate any and all of the securities listed below for his use or for any business purpose he sees fit. In return for this I understand that I am to receive $250 per month until the expiration date of November 1, 1972, with the first payment to commence on November 1, 1971 with interest to be based on the fair market value of that date.

This agreement has been entered in the presence of Genevieve Ludwiczak, Dale R. McDonald, William H. Brown and William Lynam this 8th day of September, 1971.

It is further agreed that at the expiration of this agreement both parties being satisfied the option to continue same agreement shall be renewed.

[Certificate numbers and security descriptions omitted]

---

**13.** The hypothecation agreements ordered to be cancelled were those relating to the securities of Beringer, H. Calig and Kennan, as Trustees, and of Kennan and of Albert and Malkie Debo.

The securities were turned over to the Receiver and the Trustee upon the Bank's offer to place them with the Court. The Bank stated that its files had indicated the propriety of such a "gesture", in that some securities were registered as held in trust and that some hypothecation agreements were missing or were only partially filled out (T. 350–355). The Bank indicated that it was offering "to turn (the securities) over to release all claims which (it) might have against them" (T. 351). Either the Receiver or the Trustee received the securities, as reflected by the individual corporation's records (with certain exceptions).

**14.** On February 12, 1976, the United States Attorney moved to amend the Order disallowing suits against the Defendants, to clarify that the United States Attorney and the Internal Revenue Service might pursue any person or entity involved in these transactions and to indicate that it does not apply to any criminal prosecutions. The Court so clarified the Order.

**15.** "T" refers to Transcript of Testimony at January 5, 1975 Hearing unless otherwise indicated.

**16.** In addition to Thompson securities, Equibank holds securities pledged by Brown in the names of Valetta Beltz, Robert Wilkin, Edna Beringer, M. Elizabeth Groom, Elsie Mae Roenigk, Francis Calig, H. L. Calig, Jane D. Brown and Malkie Debo, Mary Kennan, and Malkie and Albert Debo.

SIGNED: /s/ James W. Thompson
James W. Thompson
/s/ Helen I. Thompson
ATTEST: /s/ William H. Brown
WITNESS: /s/ Dale McDonald
/s/ Genevieve Ludwiczak
/s/ William J. Lynam

This letter did not suit Equibank, and on December 14, 1971, Brown submitted the highly technical "Letter of Consent To Pledge and Hypothecation" on the Bank's form which contained, *inter alia,* the following:

to pledge and hypothecate under the terms of your general loan and security agreement and/or security agreement note forms or otherwise, for the Borrower's own account or otherwise the collateral as hereinafter set forth, and the Undersigned agrees that, when so pledged and hypothecated, the collateral shall secure, and that a security interest in the collateral and the proceeds thereof including, without limitation, all rights, warrants, substitutions, cash or any other thing of value pertaining thereto exist and will continue to exist in your favor as security for, any and all loans and/or advances at any time or from time to time made by you to the Borrower, any present or future indebtedness or other obligations of the Borrower to you, and all other indebtedness or other obligations, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, howsoever evidenced or acquired, and whether joint, several, or joint and several, or independent of the Borrower, and any renewals or extensions of any or all thereof (all being hereinafter called the 'Liabilities of the Borrower') . . .

William Densmore, National Loan Officer of Equibank, testified that the original letter of the Thompsons to Brown would not

have been sufficient authority to authorize a loan to Brown, absent specific subordination provisions and broader hypothecation rights (T. 204).

The loan was then granted by Equibank to Brown for the stated purpose of increasing the capital of ISC, of which he was President, on securities in the names of the Thompsons covered by blank stock powers, the hypothecation letter to Brown with the one year period of duration, and the unlimited "Letter of Consent". But here the problems multiply.

The Thompsons testified they never saw Genevieve Ludwiczak (a purported witness to their letter) or Joann Fragale (who allegedly notarized it); [17] had no dealings with Western Pennsylvania National Bank or its successor, Equibank; and denied ever having executed the stock powers.[18] Brown was not called to testify after representations by his counsel that if called, he would "take the Fifth Amendment" against compulsory self-incrimination. We must therefore piece together much of what occurred from this time on.

On December 29, 1971, Equibank notes a $5,000.00 payment by Brown on its original loan of $37,500.00 and another payment of $500.00 on March 15, 1972 and one of $15,000.00 on June 12, 1972, leaving a balance of $12,500.00. This was increased on November 22, 1972 by $20,000.00 and $20,000.00 was paid off on January 22, 1973. On September 6, 1973, a loan of $18,000.00 was made to Brown. The purpose of this loan was noted as "working capital loan for real estate venture" (T. 176).[19] In December of 1973 there was a record made that "the collateral is in the form of hypothecated certificates which would cause considerable problems should we have to liquidate" (T. 179).

In any event, by July 12, 1974, the amount due Equibank by Brown was $102,-

---

**17.** Mrs. Ludwiczak or Fragale were not called as witnesses. It was reported to the Court that Ludwiczak was deceased and that Fragale was not found.

**18.** An expert testified it was the Thompsons' signatures on the stock powers.

**19.** The files of ISLC contained an account for James and Helen Thompson apparently taken over from ISC in September of 1973, showing a monthly payment to Thompson of $157.50 (the Customer Data Card of ISC), but no listing of the securities pledged to Equibank.

946.55, reduced by payments of $40,000.00 on October 25, 1974 and $15,000.00 on December 23, 1974.

## IV. UNIFORM COMMERCIAL CODE.

Under Section 8–301(2) of the Uniform Commercial Code there is extended protection to bona fide purchasers of investment securities by a provision for acquisition of a "perfect title".

§ 8–301. *Rights Acquired by Purchaser; 'Adverse Claim'; Title Acquired by Bona Fide Purchaser*

(1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security. [Footnote omitted]

(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.

(3) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.

Section 8–302 then defines a "bona fide purchaser" as, "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank."

The Code then provides:

§ 8–304. *Notice to Purchaser of Adverse Claims*

(1) A purchaser (including a broker for the seller or buyer but excluding an intermediary bank) of a security is charged with notice of adverse claims if

(a) the security whether in bearer or registered form has been indorsed 'for collection' or 'for surrender' or for some other purpose not involving transfer; or

(b) the security is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor. The mere writing of a name on a security is not such a statement.

(2) The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims. If, however, the purchaser (excluding an intermediary bank) has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims.

It was the testimony of both James and Helen Thompson that at no time during the course of the commercial transaction was a conversation held with Equibank regarding their securities or hypothecation thereof. The instant case exhibited Equibank's reliance on the papers in their possession, in a situation they knew to be precarious and against normal procedures, in approving loans to Brown and ISC interchangeably, as shown by the following excerpts of testimony of William Densmore under questioning by Attorney Lefkowitz, counsel for the Receiver of ISLC:

Q. So before this February 25, 1971, memorandum, approximately seven (7) months before the first of the Hypothecation Agreements that you hold for the personal loans, you were aware that Investors Security Corporation could be holding customers' securities in customers' names, and you should be very careful about them in loan transactions?

A. That is exactly right.

Q. That is what the note says, right?

A. That is exactly right. (T. 129)

And Mr. Densmore's response to the Court's question (T. 141):

THE COURT: Although you took as collateral stock, that was no indication whatsoever of its ownership by Mr. Brown?

THE WITNESS: I was certainly well aware that the securities pledged on Mr. Brown's personal loan were not owned by him, and they were further not owned by the corporation.

The Bank further admits that in situations of like nature where an individual request to borrow money on collateral in the form of stock certificates issued to a third party in conjunction with a stock power signed in blank to the bearer of the securities, the loan would not be made without contacting the third party. Mr. Densmore stated in reply to Attorney Lefkowitz's further questions:

Q. If I can take a hypothetical case: If I came into your bank and wanted to borrow, personally, some money, and I brought in a piece of paper which was signed at the bottom 'Hillard Kreimer', and I brought in a stock certificate which was issued to Hillard Kreimer, and I also brought in a blank stock power which was issued to Hillard Kreimer, a Hypothecation Agreement, and said, 'Here, lend me money up to sixty (60%) percent of the value of the securities'; would you do it?

A. Are they your securities?

Q. No, no, Mr. Kreimer's securities.

A. I doubt that I would at that point.

Q. Why would you do it for Mr. Brown? You would want to do it for Mr. Kreimer, wouldn't you?

A. I think there would be some communication there.

Q. If Mr. Kreimer came in and said, 'I will sign my hypothecation, and I will allow you to hold these securities' for his pledge, and perhaps if you knew there was perhaps some close family tie, I am sure you would do it. I know banks have done this on many occasions. It is fairly common to take third party securities, isn't it, for collateral?

A. That is correct.

Q. But, obviously, you would like to have contact with the third party?

A. That is correct.

Q. Now, do you see any difference between making such a loan to me with Mr. Kreimer's securities, and dealing with a person who is also a stock broker and handling other people's securities every day of his existence?

A. Not really. (T. 159–160)

The evidence further reveals that information was known to Equibank that Brown had acted in like fashion in the past regarding utilization of other people's collateral. Responding to Attorney Lefkowitz's question, Mr. Densmore said (T. 264):

Q. I call your attention to the credit information received from Union Bank, wherein Union Bank says that Mr. Brown came back in 1974, that they turned him down because he used other people's collateral too much. Is that what it says there?

A. Yes.

The case of *Norman v. World Wide Distributors, Inc.*, 202 Pa.Super. 53, 195 A.2d 115 (1963), involved a suit brought by the maker of a note against the payee and holder of the note to have a judgment which had been obtained by the holder against the maker declared void and to rescind the purchase agreement between the maker and the payee on the ground of fraud. The Superior Court was required to determine the effect of the holder's knowledge of the circumstances which should have caused the holder to inquire concerning the payee's method of obtaining the note, and the conduct of the holder showed that the holder had suspicions concerning the note.

Judge Woodside, for the unanimous Court, stated as follows (195 A.2d at pp. 117–118):

'The freedom from the defense of prior equities afforded to a holder in due course is an extraordinary protection, which, although having its origin in the law merchant, is closely akin to similar protection given in other types of cases by courts of equity; and running through

all the authorities dealing with holders in due course we find the principle, not always stated, perhaps, that he who seeks the protection given one in that position must have dealt fairly and honestly in acquiring the instrument in controversy and in regard to the rights of all prior parties, this is, the kind of good faith which the law demands, and the principle is closely analogous to the equitable doctrine of clean hands.' *Fehr v. Campbell,* 288 Pa. 549, 558 137 A. 113, 116, 52 A.L.R. 506 (1927).

■ He who seeks protection as a holder in due course must have dealt fairly and honestly in acquiring the instrument as to the rights of prior parties, and where circumstances are such as to justify the conclusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the title, the person is not a holder in due course. *Stroudsburg Security Trust Co. Case,* 145 Pa.Super. 44, 48, 49, 20 A.2d 890, 892 (1941); *Fehr v. Cambell, supra,* 228 Pa. p. 555, 137 A. p. 115, 52 A.L.R. 506.

■ When the defense of fraud appears to be meritorious as to the payee, the burden of showing it was a holder in due course is on the one claiming to be such. *Budget Charge Accounts, Inc. v. Mullaney,* 187 Pa.Super. 190, 193, 144 A.2d 438 (1958); *Stroudsburg Security Trust Co. Case, supra,* 145 Pa.Super. p. 49, 20 A.2d p. 893; *Fehr v. Campbell, supra,* 288 Pa. pp. 554, 555, 137 A. p. 115, 52 A.L.R. 506.

■ The appellant here had knowledge of circumstances which should have caused it to inquire concerning the payee's method of obtaining the note. Peoples knew enough about the referral plan to require it to inquire further concerning it. The fact that the appellant's vice president called the makers of the note and denied any connection with the referral plan, indicates his own suspicion

concerning it. The frequency with which the principals changed the name under which they were operating—three times in approximately one year—should have added to his suspicion. Furthermore, the appellant paid $831 for a $1,079.40 note payable three days after date. See *Gimbel Brothers, Inc. v. Hymowitz,* 160 Pa. Super. 327, 329, 51 A.2d 389 (1947). Under all the circumstances, Peoples was bound to inquire further into the operation of the seller of these notes, and having made no inquiry, it is held as though it had knowledge of all that inquiry would have revealed. *Fehr v. Campbell, supra,* 288 Pa. p. 556, 137 A. p. 116, 52 A.L.R. 506. See also *Fidelity Trust Co. v. Gardiner,* 191 Pa.Super. 17, 155 A.2d 405 (1959).

In the instant case it is abundantly clear that Equibank not only dealt in a fashion which was obviously suspect in regard to the loans to Brown and/or ISC, but also departed from standards considered normal business practice. There appears in the testimony the following discussion with Robert Jones, one of the employees of Equibank (T. 249–50):

THE COURT: —that at that time on December 3, 1973,[20] you were aware that the stock you were holding as collateral belonged to the customers of the brokerage firm as far as technical ownership was concerned?

THE WITNESS: Yes, sir, most of them, if not all—I think there might have been one or two of Mr. Brown's, but, yes, sir, that is basically very true.

THE COURT: And what you really referred to at that time, was it not, your own concern over the fact that the stocks were hypothecated with respect to private loans of William Brown; isn't that exactly what you had in mind whe[n] [sic] you wrote that phrase?

---

**20.** Equibank's records on Investors Security, Receiver's Exhibit 6, contains the following entry for December 3, 1973:

"The company's financial condition is poor with a deficit net worth of $214,600.00 and liabilities of $1,608,100.00 as of 12/31/72.

Investor's Security has operated at a loss for the last two years and it is doubtful that 1973 will be profitable.

R. M. Jones, Jr.   /s/ RMJ"

THE WITNESS: I am sorry. Would you repeat that for me, please?

THE COURT: Would you read it back?

\* \* \* \* \* \*

THE WITNESS: Yes, sir, I would have to say that is one of the factors.

Further illustration of the principles involved can be found in *Young v. Kaye,* 443 Pa. 335, 279 A. 759 (1971). That case involved an action to acquire title to a block of stock in the Kinzua Oil and Gas Corporation, concededly owned by Young until late 1966 or early 1967, at which time Fred Young, on his own behalf and on behalf of his wife, Mercedes, caused a certificate to be executed for such block of stock registered in the name of Melvin Brooks. In December of that year, Brooks sold the same stock to Traner Associates and the Court determined that the stock transfer from the Youngs to Brooks was voidable because of the confidential relationship between Young and Brooks, and because Traner Associates did not have good title to the stock by virtue of the circumstances in which it acquired the stock from Brooks. Primarily referring to the Brooks-Traner Associates' transfer, the Court stated as follows (279 A. 764, at 765–66):

. . . Traner Associates clearly purchased the Kinzua stock for value and took delivery of the same. The record is largely silent, however, as to whether or not it purchased in good faith and without notice of Young's adverse claim. Thus arises the crucial question: in a silent record case, does the adverse claimant bear the burden of proving that the holder of the security is not a bona fide purchaser, or, to the contrary, must the holder affirmatively demonstrate that he is a bona fide purchaser? We believe the burden of roof rests upon the holder in such a situation.

\* \* \* \* \* \*

As is readily apparent, the new and present version of Section 8–105 no longer makes any express reference to the burden of proof rules contained in Section 3–307, and subsection (d) speaks only of the 'plaintiff' having the burden of demonstrating that a defect or defense is ineffective against him. Accordingly, Traner Associates argues that since it is a 'defendant' in the instant action, Section 8–105 is inapplicable and it does not have the burden of proving that it is bona fide purchaser. This argument is defective in two respects.

In the first place, we do not believe that the Commissioners intended such a drastic change in the law by mere omission and implication. That no such change was intended is confirmed by a comparison of the text of the official comment to the original version of Section 8–105 with the text of the official comment accompanying the amended Section 8–105. The original comment ended by declaring that 'by subsection (2) of this section the particular rules stated in Section 3–307 for the negotiable instruments governed by Article 3 are made applicable also to securities.' The present comment to amended Section 8–105 contains the practically identical language that 'by subsection (2) of this section the particular rules stated in Section 3–307 for the negotiable instruments governed by Article 3 are adapted to securities.' In these circumstances we do not believe that amended Section 8–105 changes the law relating to burden of proof.

Moreover, even if we were to accept Traner Associates' interpretation of the present Section 8–105, the most that would be established would be that the Code does not presently speak to the issue of who bears the burden of proving whether or not the holder of a security is a bona fide purchaser, and in the absence of a specific statutory directive we would apply our general common law rule of evidence that '[i]f the existence or nonexistence of a fact can be demonstrated by one party to a controversy much more easily than by the other party, the burden of proof may be placed on that party who can discharge it most easily.' *Barrett v. Otis Elevator Company,* 431 Pa. 446, 452–53, 246 A.2d 668, 672 (1968) (citing Wig-

more). It is manifest that in the vast majority of cases it will be much easier for the holder of a security to prove that he is a bona fide purchaser than for an adverse claimant to prove otherwise. For this reason, even if Section 8–105 were interpreted to be inapplicable to this burden of proof issue, we would nevertheless place that burden upon the one claiming the status of bona fide purchaser. [Footnote omitted]

*Young v. Kaye, supra,* is most applicable to our situation since Young, an octogenarian at the time of the disputed stock transfer, as Thompson in the instant case, had no apparent knowledge of the intricacies of federal, personal and corporate income tax laws. Thompson was willing to rely on the advice of his agents and had no additional independent advice on the matter, depending solely on the recommendations of Lynam and Brown, who had been his investment consultants over varying periods of time. In this case, as in *Young,* there can be little doubt that both Thompson and his counterpart in *Young* were in positions to be exploited, and Thompson was in fact exploited by the failure of Equibank to make any inquiries.

We are holding here that Equibank cannot assert a position as a holder in due course but must take them subject to the adverse claims.

We now move to Section 8–315 of the Uniform Commercial Code which provides as follows:

§ 8–315. *Action Against Purchaser Based Upon Wrongful Transfer*

(1) Any person against whom the transfer of a security is wrongful for any reason, including his incapacity, may against anyone except a bona fide purchaser reclaim possession of the security or obtain possession of any new security evidencing all or part of the same rights or have damages.

(2) If the transfer is wrongful because of an unauthorized indorsement, the owner may also reclaim or obtain possession of the security or new security even from a bona fide purchaser if the ineffective-

ness of the purported indorsement can be asserted against him under the provisions of this Article on unauthorized indorsements (Section 8–311).

(3) The right to obtain or reclaim possession of a security may be specifically enforced and its transfer enjoined and the security impounded pending the litigation.

As has been noted, Section 8–302 provides that the bona fide purchaser must be one who takes for value in good faith and without notice of any adverse claims. Now, good faith is defined by Section 1–201(19) as follows:

'Good faith' means honesty in fact in the conduct or transaction concerned.

In addition, Section 1–201(25) provides:

A person has notice of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act.

Under Section 8–304, as has been noted, the mere fact that the stocks appeared in the name of third parties did not put Equibank on notice of the defect, but we must still examine the "good faith" of Equibank. In that regard, we have come to the conclusion that Equibank's failure to make inquiry in this case arose from the suspicion that such inquiries would disclose the very thing Union Bank had warned it about: that Mr. Brown was using collateral in a fraudulent manner. From all the facts and circumstances which were known to Equibank, inquiry was required, and that inquiry was never made. Thus, under Section 8–315, a person against whom the transfer of a security is wrongful, may then reclaim possession of that security.

It is noted that the above discussion primarily centered on the Thompsons and although Valetta B. Beltz was unable to testify, her situation was very similar. She entered into a written contract with Brown personally on or about September 15, 1971. The contract had terms and conditions substantially identical to those of the Thompson-Brown agreement of a week earlier. On the Receipt and Delivery Blotter of ISC for May 12, 1971, there is a receipt in the name of Valetta B. Beltz for 70 shares of United States National Bank in Johnstown from Command Securities and delivery of the certificates to Miss Beltz on the same day. Thus, she and the Thompsons, in effect, loaned their securities to Brown personally and some payments were made. The law as above set forth is specifically applicable to her.

The other party whose securities were threatened to be sold by Equibank was Francis Calig. In this instance, there is no indication whatsoever that the securities ever came through ISC, but appear to have been turned over to Equibank about September 11, 1973.

There is a hypothecation agreement executed by Francis Calig which is not witnessed and a signed blank stock power without any signature guarantee, although the form itself indicates that the signature guarantee "should be made by a member or member organization of the New York Stock Exchange". Mrs. Calig had made subordinated loans in an amount in excess of $67,000.00, but the 375 shares of Hatteras Income Securities, Inc. pledged to Equibank were not part of the subordinated debt of ISC, nor were the securities traceable through the ISC Receipt and Delivery Blotter.

Then there is the stock of Jane D. Brown, the wife of William H. Brown, and Malkie Debo, the mother-in-law of William H. Brown. Jane Brown is a shareholder of ISC, its Vice President, Secretary-Treasurer, and a member of its Board of Directors. Again, there was a hypothecation agreement executed by Jane D. Brown, witnessed by William H. Brown and a similar agreement executed by Malkie Debo, witnessed by Jane D. Brown. The Debo agreement is dated June 5, 1970 and the Brown agreement is dated December 29, 1971. There was a blank stock power signed by Malkie and Albert Debo covering 461 shares of Supervised Investors Summit Fund, Inc. registered in their joint names. This stock power was neither witnessed nor was there a signature guarantee, and, again, there was no account under either ISC or ISLC relating to Jane D. Brown or Malkie Debo.

There is a stock power signed by Robert P. Wilkin, with the signature guaranteed "Equibank, N. A., Pittsburgh, Pa., Leo J. Rebholz" and guaranteed by William H. Brown. There is a hypothecation agreement signed and guaranteed the same way for 1,352 shares of Oppenheimer Time Fund. It is noted that Mr. Rebholz's work for Equibank had been in the Monroeville Office from April, 1972 to December, 1975. Mr. Rebholz stated he guaranteed these signatures as a matter of course, without ever seeing the people. He claimed he was only guaranteeing William Brown's signature, and said he had received no instructions concerning the use of the stamped signature guarantee (T. 77). He stated *positively* that he was *only* guaranteeing William Brown's signature and did so because that was what he was told to do. He admitted never having met or seen Valetta B. Beltz, Robert Wilkin, Edna Beringer, or M. Elizabeth Groom. This testimony is incredible.

As to Edna L. Beringer, there is a blank hypothecation agreement and a stock power covering 1,053 shares of Shareholder's Trust of Boston. The name appears as Edna L. Beringer, "Trustee under Deed of Trust dated 5/5/72".

As to Elsie Mae Roenigk, there is a blank hypothecation agreement and blank stock power issued to cover 440.606 shares of Franklin Custodian Funds, Inc. Again, signature guarantee by Leo Rebholz appears thereon.

There is a blank stock power signed by M. Elizabeth Groom covering 524 shares of Shareholder's Trust of Boston. Wilkin and Groom fall into the same class. Mr. Wilkin

testified that he had been approached by Mr. Lindsay to put his Oppenheimer Time Fund up as backing for stock deals and that he signed the papers, knowing that his securities were to be pledged. On March 18, 1974, Oppenheimer sent a statement to Wilkin advising him that his shares had been issued in certificate form. The ISC Receipt and Delivery Blotter contains an entry for March 22, 1974, showing receipt from ISLC of a certificate in the name of Robert P. Wilkin and its delivery the same day to Mr. Lindsay. Subsequently, Wilkin received a letter on ISLC letterhead and dated March 24, 1974, acknowledging receipt of the Oppenheimer Fund and authorizing semi-annual payments of $127.60. Mr. Wilkin acknowledged execution of the ISLC letter and receipt of two payments. Miss Groom received a similar letter from ISLC concerning her shares.

The sum and substance of all of the above is that the Bank is not presently the holder in due course of any of these securities. To consider the disposition of the securities we will divide them into classes depending on the proof of handling.

## V. THE DISPOSITION OF THESE SECURITIES.

Applying the law as previously set forth that Equibank can not be permitted to retain the securities in its hands, we come to the matter of the proper disposition of such securities.

One can only conclude that there was no clear proof of purchase or sale of any of these securities either through ISLC or ISC. They will, however, be divided into six classes for the purposes of our consideration as to their disposition, as follows:

Class 1–The stock of the Thompsons and Valetta Beltz which was given directly to Brown and on which Brown was to make monthly payments. The stock was then pledged by Brown for his loans.

Class 2–The stock of Robert Wilkin and M. Elizabeth Groom which was passed through ISC to ISLC, and then to Brown, who pledged it for his own obligations. This includes Edna Beringer's securities.

Class 3–The stock of Elsie Roenigk which went to ISLC and then to Brown, who pledged it for his personal obligations. (Here, the ISLC letter signed by Brown, acknowledged and accepted the shares of Franklin Custodian Fund, and the ISC Receipt and Delivery Blotter shows the receipt of the stock from a New York bank on April 12, 1973 and the Dreyfus Fund at a later time.)

Class 4–The stock of Francis Calig which was not received by either ISC or ISLC, nor is there any evidence as to how this stock was in Brown's hands. This class includes Mary Kennan's stock.

Class 5–The stock of Jane D. Brown and Malkie Debo, both family relatives. Also included here is the stock of Albert Debo.

Class 6–The Brownsville Municipal Bonds, in bearer form, delivered to Brown by James W. Thompson, in replacement for Atlas Credit Corporation Debentures.

## A. THE CLAIM OF THE TRUSTEE FOR INVESTORS SECURITY CORPORATION.

The Trustee was appointed pursuant to the liquidation proceeding under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa, et seq. and, in accordance with the provisions of the Act, is required to return specifically identifiable property to customers entitled thereto and to distribute the single and separate fund. Thus under the Act, the Trustee's involvement (§ 6(a)(1)(A) and (B) and § 78fff(a)(1)(A) and (B)) is primarily a question of whether such securities are either (1) specifically identifiable, or (2) part of a single and separate fund.

■■■ To be specifically identifiable property, a security must have remained in its identical form and have been in the possession of ISC on the filing date (September 15, 1975), or have been allocated to, or physically set aside for, the customers of ISC on that date. It is clear that these securities were not segregated in bulk as contemplated by the Act. In *Securities and Exch. Com'n. v. Albert & McGuire Sec. Co., Inc.,* 378 F.Supp. 906 (E.D.Pa.1974), the

Court stated (at 910), " 'bulk segregation' in view of the history of the Act pertains to securities which have been received or acquired for the accounts of customers who have an immediate right to receive such securities from the broker." In *S.E.C. v. F. O. Baroff Company, Inc.*, 497 F.2d 280 (2d Cir. 1974), and for the same reasons, customer protection was denied to an individual who loaned securities to a broker under hypothecation letters. The securities registered in Class 1 and Class 3 above were in the possession of Equibank and not ISC on the filing date. The Trustee, therefore, has no claim on these securities.

The securities registered in Class 2 were also in the possession of Equibank and not ISC on the filing date. The issuance of these securities in certificate form by the respective firms, the delivery of the certificates to ISC, their re-delivery to Mr. Lindsay do not constitute the requisite entrustment to ISC since the acts were undertaken pursuant to agreements between the registered owners and Mr. Lindsay, and ratified and confirmed in writing by their respective owners upon their completion.

There is no evidence of any kind to indicate that the individuals comprising Class 4 were ever dealt with in any manner by ISC. Their stock could not therefore be specifically identifiable property, or part of the single and separate fund, or part of the subordinated debt of ISC.

As far as Class 5 is concerned, again, ISC had no connection with this stock. There is no evidence that the transaction involving such securities was anything more than a transaction among the immediate members of a family.

█ The bonds in Class 6 do not meet the criteria since the bonds were in the possession of Equibank, rather than ISC, on the filing date. By James Thompson's testimony, the bonds were delivered from his possession to William Brown's in replacement of Atlas Credit Corporation Debentures. Finally, the loan of the bonds, even if deemed to have been made for the benefit of ISC rather than Brown or ISLC, would not entitle the owner to protection under the Act since it is clear from the testimony that the loan of such bonds was not made in furtherance of trading activities from the securities market. It is, therefore, apparent that the pledged securities are not, nor can they be, the property of ISC, but must become the property of ISLC or the individual security owners.

## B. THE CLAIM OF THE RECEIVER FOR INVESTORS SECURITY LEASING CORPORATION.

The Receiver asserts that his actions for injunction against the Bank's sale and for reclamation of the hypothecated securities is based upon § 8–315 of the Uniform Commercial Code, *supra.* The Bank, he alleges, is not a qualified purchaser because as the pledgee of the securities the Bank acquired only the rights which the transferor had, and that the Bank had notice of adverse claims in that the securities were registered to third parties. The testimony allegedly shows that ISLC, and not Brown individually, was in fact the authorized beneficiary of the stock powers and hypothecation agreements executed by the owners of the securities. Further, it is contended that the record shows nothing indicating that ISLC transferred the interest it had in the securities, either to Brown or to the Bank, or that it authorized Brown to pledge the securities against any personal loans to him. The difficulty with the position here is that the circumstances of all of the hypothecations indicate that the owners were "renting out" their securities to Brown, or other individuals. From all the evidence it is apparent that ISC and ISLC were used by Brown to further his own interests. It is true that in many instances letters were received by the owners of the securities indicating receipt of the stock by ISLC. The record shows that the stock was passed through the books of ISC or ISLC and the stock then disappeared by virtue of Brown's actions when he took the securities to Equibank and borrowed personally with the stock as collateral.

We do not think it essential to decide the contention of the Receiver that adverse claims to the securities have been proven

and that the burden therefore shifts to the Bank to prove that it is a bona fide purchaser. *Cf. Young v. Kaye, supra.* We believe the record is clear that the Bank exercised bad faith and was not the holder in due course. *Norman v. World Wide Distributors, supra.*

## C. THE CLAIM OF THE REGISTERED OWNERS.

■ Section 8–315 of the Uniform Commercial Code, as we have seen, speaks in terms of the "person against whom the transfer of a security is wrongful", and such person is permitted to reclaim possession. Here, ISC and ISLC were nothing more than tools of transfer used by Brown in most instances. Thus, the owners may recover the original or new security unless the holder is a bona fide purchaser. We have held that the holder, Equibank, is not a bona fide purchaser and, therefore, the stock must be delivered to the registered owners.[21]

### APPENDIX A

#### IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE COMMISSION

v.

INVESTORS SECURITY CORPORATION
WILLIAM H. BROWN

Civil Action No. 75–1036

SECURITIES AND EXCHANGE COMMISSION

v.

INVESTORS SECURITY LEASING CORPORATION; WILLIAM H. BROWN; DALE R. MC DONALD; WILLIAM J. LYNAM

Civil Action No. 75–1304

#### ORDER OF COURT

AND NOW, to-wit, this 9th day of January, 1976, upon consideration of and hearing on the Petitions of Hillard Kreimer, Receiver, Investors Security Leasing Corporation, and Thomas P. Ravis, Trustee, Investors Security Corporation, and

1. The Court finds that there exists strong probability of irreparable harm to record owners of securities held by Equibank, N. A. and to Investors Security Leasing Corporation and Investors Security Corporation if an injunction is not granted, *see Delaware River Port Auth. v. Transamerican Trail. Tr., Inc.,* 501 F.2d 917 (3d Cir. 1974); and

2. The Court finds that there exists no adequate remedy at law, *see generally Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); and

3. The Court finds that Petitioners have shown a reasonable probability of success in the litigation, *see A. L. K. Corporation v. Columbia Pictures, Inc.,* 440 F.2d 761 (3d Cir. 1971) and

4. The Court finds that Petitioners have raised questions so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and more deliberate investigation, *see Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 (2d Cir. 1953); *Hermann v. Atlantic Richfield Company,* C.A. Nos. 71–842, 73–799 (W.D.Pa., filed May 2, 1975); *Drace v. Western Auto Supply Company,* C.A. No. 74–812 (W.D.Pa., filed September 13, 1974); *Crandall v. Conole,* 230 F.Supp. 705 (E.D.Pa.1964); and

21. The Brownsville Municipal Bonds are to be returned to James W. Thompson.

*Natco Corporation v. Great Lakes Industries, Inc.,* 214 F.Supp. 185 (W.D.Pa.1962);

IT IS THEREFORE ORDERED that Equibank, N. A., its officers agents and employees, be and are hereby Preliminarily Enjoined from selling, transferring, liquidating or otherwise disposing of the securities held by it as collateral security for the obligations of William H. Brown, held in the names of the following registered holders: Robert P. Wilkin; M. Elizabeth Groom; Elsie Mae Roenigk; Valetta B. Beltz; James W. Thompson and Helen I. Thompson; Jane D. Brown and Malkie Debo; and Mrs. Francis Calig; but shall hold the same subject to further Order of this Court.

IT IS FURTHER ORDERED that Equibank, N. A., its officers, agents and employees, be and are hereby Preliminarily Enjoined from selling, transferring, liquidating or otherwise disposing of Brownville Municipal Authority Sewer Revenue Bonds, Series A, dated December 1, 1968 and due December 1, 2008, numbered A447 and A448, held by it as collateral security for the obligations of William H. Brown; but shall hold the same subject to further Order of this Court.

IT IS FURTHER ORDERED, as agreed to by all counsel, that Equibank, N. A. be and is hereby directed to surrender forthwith to Hillard Kreimer, Receiver, Investors Security Leasing Corporation, as an officer of the Court, the securities held by Equibank, N. A. as collateral for the obligations of William H. Brown, together with all stock powers attached thereto, registered in the name of Edna Beringer, Trustee; to be held by the said Receiver subject to further Order of this Court.

IT IS FURTHER ORDERED, as agreed to by all counsel, that Equibank, N. A. be and is hereby directed to surrender forthwith to Thomas P. Ravis, Trustee, Investors Security Corporation, as an officer of the Court, the securities held by Equibank, N. A. as collateral for the obligations of William H. Brown, together with all stock powers attached thereto, registered in the names of the following holders: H. L. Cal-

ig, Trustee; Mary Kennan, Trustee; Mary Kennan; and Albert and Malkie Debo; to be held by the said Trustee subject to further Order of this Court.

IT IS FURTHER ORDERED that the Hypothecation Agreements executed by Edna Beringer, Trustee; H. L. Calig, Trustee; Mary Kennan, Trustee; Mary Kennan; and Albert and Malkie Debo, shall be marked "cancelled" and retained by Equibank, N. A.

IT IS FURTHER ORDERED that this Preliminary Injunction shall remain in full force and effect until further Order of this Court.

IT IS FURTHER ORDERED that a Hearing for Permanent Injunction shall be held on March 2, 1976, at 9:30 A.M., before the undersigned in Courtroom No. 15, United States Courthouse, Pittsburgh, Pennsylvania.

s/ Daniel J. Snyder Jr.
UNITED STATES DISTRICT JUDGE